Good afternoon. As I did this morning, I wanted to extend again our thanks to Judge Kermit Lopez from the First Circuit for sitting with us and doing all the work involved with this sitting, so we very much appreciate it. Thank you. It's a considerable pleasure to be here. And we'll call our first case of the afternoon, Rodney Collins v. Secretary of PA Dept of Corrections. Good afternoon. My name is Kimberly Dolan and I represent Appellant Rodney Collins and I'd like to reserve three minutes of rebuttal time. No one disputes the trial counsel in this case was ineffective at the penalty phase. He was equally ineffective during the problems with the testimony of the commonwealth's eyewitness that the gun was fired from directly behind the victim from the backseat of the car. The decisions below denying relief unreasonably ignored trial counsel's failure to prepare and because of that this court need not defer to them under AEDPA. A counsel's supposed strategic decisions. I'd like you to run the because the underlying decisions were unreasonable because they ignored clear Supreme Court precedent that counsel's strategic decisions are only entitled to deference if they are based upon a reasonable investigation and trial counsel here did not reasonably investigate the case. His strategy though was a strategy he said he followed in a lot of cases where he really does best by not interviewing people but by just cross-examining them. Is that not I mean assuming the investigation you wanted him to undertake was interviewing people could it not be strategic that you really don't do that ahead of time you wait to cross-examine? It might be in a hypothetical case in this case it was not because clearly counsel did not have a command of what the ballistics evidence were in the case which led him to adopt and box himself into a defense that turned out to be completely unreasonable and he knew this he knew this and he told the court as soon as he learned about the lead residue tests on the headrest he went to the court at sidebar and said this is going to require great investigation on my part and possibly some work with experts he told that to the court he warned the court about that and the court said well you might as well get rolling on an expert he didn't do that he did nothing. He had notice of the testing on May 5th well by then it was a little too late there you're really folding the court for not granting a continuance well not really he at that point he shouldn't have gone he knew about the testing before he went to before he gave his opening statement so he had not only would he not investigate the case he essentially picked up the file walked into the courtroom and tried the case without looking at whether his theory about the court about the shooter being outside the car which he stuck with to the end made any sense based on the forensic evidence and just ignoring that evidence is and it is not it shows that he did not reasonably investigate the case. But the evidence from the ballistics forget the lead residue for a minute but the expert forget his name Firon was it? Welch. Finer the commonwealth expert Finer yes. His evidence could be consistent with somebody shooting outside or not really because he was talking about 18 inches or less. No he said it was 18 inches or less he said it had to be inside and more specifically he said it had to be in the back and our the expert that we hired on PCRA said that first of all it was apparent that the shots came from left to right in the car from the driver's side that a gun was shot inside the car based on the lead testing which is completely contradictory what trial counsel argued and it was unlikely that the shots came from the back seat. The evidence was consistent with the driver and the actual pattern of lead residue on the headrest went from left to right. This is something that the jury never heard in this case. Well I was under the impression based on magistrate judge Strowbridge's opinion that your expert perhaps a very fine person wilted a little bit on that point on cross gunfire could have come from behind that it might have been awkward to do that but that the shots could have come from behind and so it wasn't quite as clear cut as our expert would have said something diametrically different. Well I would ask this court to look at that part of the Welch's testimony on PCRA. He answered based on a leading question from the commonwealth's attorney but he still stuck by his opinion that it was it would have been incredibly difficult for Mr. Collins to twist himself into a pretzel and to get off the shot plus the magistrate did not take into account the fact that Welch also testified that the shots apparently went from left to right in the car based on his review of the totality of the evidence and that the lead residue pattern on the headrest went from left to right showing that shots could well have come from the driver. Now I want to read you something here from your reply brief. You say trial counsel never articulated to the jury that the shots could have come from the driver seated inside the car. In fact while counsel raised questions about Copper's credibility never pointed to the physical evidence that the shots came from the driver's side or otherwise argued that Copper was the driver. You know he may not have done a terrific job of pointing the finger at Copper but didn't he in fact during closing argument say on a few occasions let's look at Kevin Copper there's more to Copper than meets the eye here. Copper's the guy who really got the motive here. I mean. Well I'm not sure he suggested that about motive. I mean he certainly had to deal with the fact that Copper had inconsistent statements and he basically was contradicting himself. But the fact is that what does counsel have an obligation to tell the jury? Does the counsel say wink wink, nudge nudge, look at Mr. Copper, I don't know what to do with him. The counsel has an obligation. The jury can't interpret lead residue testing, can't interpret the forensic evidence. Counsel has an obligation based on a reasonable investigation to do that for the jury. Now this, you are focused in on, honed right in on the lack of a ballistics expert. And that is exactly what the Supreme Court of Pennsylvania looked at. They looked at your argument about we should have had a ballistics expert. And before us you're arguing, or at least in the briefing seem to be arguing, it's not just that he didn't have a ballistics expert, it's that he didn't do any investigation. So I guess you're making me wonder Ms. Dolan, if your whole complaint really is we should have had a ballistics expert, then why isn't the Pennsylvania Supreme Court's direct discussion of that not due deference by this court? Well first of all, we're not saying that he should have called an expert. We're saying that he should have either with the assistance of expert help, which he clearly needed at the DCRA, to bring this evidence before the jury and point out that the driver could well have been the shooter. But the reason that the Pennsylvania Supreme Court's decision is not entitled to deference by this court is because the Supreme Court didn't even look at the fact that counsel didn't prepare. Counsel walked in to the courtroom and tried the case after he opened the file. Here is trial counsel's file right here. This is the extent of it. It's essentially the notes that were produced of witness statements from the commonwealth. What are his contemporaneous notes during trial? We asked him about this at PCRA. These are his notes. If you can see from these notes, most of these were taken contemporaneously with proceedings at the trial, preliminary hearing, yes. You seem to be saying that the reason the Pennsylvania Supreme Court's analysis is not entitled to deference is because they accorded deference to trial counsel's strategic decision without recognizing the principles set forth in Strickland that those strategic decisions have to be informed by a reasonable amount of investigation. Is that, from your point of view, correct? Yes, it is. That's exactly what we're saying. And none of the underlying decisions denying a relief have owned up to counsel's lack of investigation, which even the commonwealth, the appellees in this case, don't have a response to. Yes. So the record supports the proposition that he did no investigation at all. That is your That's correct. I mean, he interviewed no witnesses, not even the main eyewitness. He didn't interview the commonwealth's forensic expert, ballistics expert, despite an express invitation from the district attorney that you could talk to this guy and see what he's going to say. He didn't have a report from him. He didn't know what he was going to say. He didn't have the car examined. He didn't go to the scene. At PCRA, he had absolutely no recollection of how much time he spent preparing for trial. The only steps he did was basically to read the discovery. And it's clear that he read that in court. When you look at his notes, his trial notes are essentially two pages. And there's a half page of notes of testimony in court, a witness list, which he prepared ahead of time, and then another half page of notes. And that's it. I mean, he obviously walked into this courtroom, opened the file, and tried the case. And that's not a reasonable investigation for a capital murder trial. Where was he held? At what stage was he held ineffective for failure? Ineffectiveness at the penalty phase. At the PCRA trial court. And does that have any, does that have a legal consequence when we're looking at what we're looking at here? Other than the fact that you could say he didn't do a good job there. I think the inference is that he didn't do a good job there, and he certainly did the same, put the same level of preparation into the guilt phase, yes. Now, let me ask you, if I might, about prejudice. It seems that the magistrate judge was, in the report and recommendation, thought at most you got another shooter there, even if somebody bought the testimony of Mr. Welch. And that that doesn't counteract the medical examiner's evidence, the ballistics evidence from the police. So even if you had had a better investigation, and you'd had somebody come in like Mr. Welch and give testimony, you still would not have been reasonably likely, or a reasonable probability of an acquittal. Since the PCRA trial courts, presumably, and certainly the Pennsylvania Supreme Court, and the magistrate judge, and the district judge all thought there's not prejudice here, why should we say those folks don't know what they're talking about? Well, none of them, none of those decisions own up to the trial counsel's lack of preparation. And when you see how unprepared he was, you understand that the jury had no, okay, you have to look at the scale. I understand, let me talk about prejudice. Let me back a minute. The state court did not rule on the prejudice. That's correct. The state court, the Pennsylvania Supreme Court did not rule on the prejudice. So therefore, we're not deferring. Yes, that's correct. That's correct. You're not deferring to that. So you get to look at the issue. Don't worry about the car. We'll find one. Right, so you don't need to defer to that. So, and the reason that the underlying opinions are wrong about this, because essentially, if a jury, if a juror believed that a gun had been shot inside the car, and there was nothing that counsel did to credibly refute that fact, then they had to believe that Mr. Collins was guilty, as opposed to Mr. Cofer. And that was a fact that trial counsel absolutely had to controvert, and he just didn't do it. He just was not prepared for it. He basically shrugged his shoulders and said, I don't know what to do with it. The evidence isn't scientific enough. They didn't prove it to a reasonable degree of scientific certainty, and that's absurd. Aren't the letters problematic for your client, though? The letters are not problematic because, first of all, there was an actual handwriting test done at trial that they were not done, they were not in our client's handwriting. Where did the letters come from? I suggest that the letters came from somebody setting up Mr. Collins. The driver could clearly have set up Mr. Collins, and his mother, the driver's mother brought those letters in. Well, I guess counsel was ineffective for not arguing that as well. I see that I have a red light. The trial transcript is something very difficult to figure out, and for us to try to figure out that the result would have been different is very difficult as well. We'll hear from you on rebuttal. Okay, thank you. Thank you. Good afternoon, your honors. May it please the court, Molly Lorber from the Philadelphia District Attorney's Office on behalf of the appellees. The question properly before this court is whether the Pennsylvania courts applied Strickland in an objectively unreasonable manner in rejecting the claim that Collins submitted to them. Specifically, that claim was a layered claim that appellate counsel was ineffective. We're, you probably should, for my purposes, let's talk about a claim about trial counsel. Certainly, your honors. Because I think what we're talking about trial counsel, the Supreme Court talked about trial counsel, the magistrate judge talked about trial counsel, district court, we want to talk about trial counsel. So let's get past the layered stuff and ask the question posed by your opponent, how could we give deference to a Supreme Court decision which doesn't even address the lack of preparation, goes straight to the strategy without talking at all about this guy did nothing to arrive at a strategy. Well, I think that the record is not as straightforward as my opponent would have you believe in terms of a lack of preparation. One thing that my opponent really neglects to mention is that it is in fact, if you read the whole trial transcript, it is in fact quite clear an important reason that trial counsel had for not focusing his defense theory on implicating Kevin Koffer. Now let's back up, back up. You said the record is not as clear as your counsel, as opposing counsel would say in terms of lack of preparation. What is the record clear about in terms of what preparation Mr. Savino did do? Well, your honor, that respectfully, clearly he, I think the PCR array record is clear that he reviewed the evidence that was provided to him by the commonwealth. Okay, what's that? That he interviewed his client. A couple of reports. I'm sure it was more than a couple of reports. I mean, I must say with all candor that this issue about exactly the nature of every piece of minutiae the counsel did or didn't do in terms of his preparation was not the focus of proceedings up until this point.  Yeah. They're making a pretty dramatic statement, which is this person did virtually nothing. The commonwealth offered to have their people interviewed by him, a freebie. We're going to give you our police officers. The guy who's going to be the ballistics expert. He declines to even interview or talk to him. Never looks at the car. He's given a, when he's asked about it at the PICRA hearing, the strategic decision you made was to rely on yourself as the answer is yes. Is that a legitimate quote strategy? Absolutely, your honor. I'm just going to rely on me. I'm not talking to anybody. I'm not looking at forensics. I may be surprised. Absolutely, your honor, and I will tell you exactly why. In this particular case, the course of action that opposing counsel is currently advocating simply would not have worked given the realities of the trial, which trial counsel clearly knew about. Now you're talking to prejudice. No, I'm not talking about prejudice, your honor. With all due respect, I am talking about counsel's reasonable decision making in terms of his strategy for trial. Now, one thing that my opponent does not address is that... there was no way that he could have addressed, Savino could have addressed this. Are you thinking about a specific kind of evidence? Are you talking about the medical examiner? What are you thinking about? I'm getting to this right now, your honor. The problem with the course of conduct advocated by opposing counsel is that it's a course of conduct which says we're going to focus the defense theory on pinning the crime on Kevin Koffer to the exclusion of anyone else. The idea is, if I'm understanding you... No, I don't think that's... I think it's if you had decided, if you had figured out what the evidence was and the ballistics, you could have figured out what your possible arguments were, and you probably would have abandoned your boys from the bottom argument. And maybe you wouldn't have pointed at Koffer. You might have come up with something else, but you certainly wouldn't have made your main thrust of your argument that it was from outside the car. Respectfully, your honor, I think that counsel had no choice in that regard because his own client was telling him it can't be an inside-the-car-shooter theory. In the record where the letters written by Collins to Koffer were read out loud in court and to the jury, if you'll bear with me a moment, I'd like to read it to your honors. Assume it was from Collins. They were absolutely from Collins, your honor, and I'm glad that you mentioned that because I feel that, unfortunately, my opposing counsel is mischaracterizing the evidence in that regard. The place in the record that she points to as saying that there was some sort of conclusive determination by a handwriting expert that the letters were not written by Collins... They couldn't conclude for sure they were. They couldn't conclude one way or another. The place in the record she points to is simply Collins' testimony that he didn't write them. When you take a look at what was said in the letters, it's quite clear that no one else could have written those letters. He says in his letter to Kevin Koffer, I prefer that in an effort to straighten this lie out that's about to cost an innocent man his life, the necessary steps must be taken to clear us both. I prefer to do it this way because Louis Savino is trying to turn the tables from one innocent man, me, to another, clearly meaning Koffer. The statements then broads made me nothing, so to clear us both you must sign and fill out this form and return it to me because I didn't know anything to tell the police, so I refuse to work with this lawyer to try to put you on the spot. Counsel, does Mr. Savino defend the decisions he made in the very terms that you're now offering? Does he say that he was hamstrung by the way in which his own client wanted the case presented? No, Your Honor. He doesn't go quite that far, but you have to remember that the PCRA hearing took place many years after the trial in this matter. And more importantly... Well, at the time, he didn't have any problem pointing the finger at Koffer. He seems to be saying I was pointing the finger at Koffer. But I think... He said in the text of testimony, I told him it was Koffer, maybe outside the car, but it was Koffer. And he does talk about Koffer repeatedly in his closing argument, so... That's right, but I don't think... It's a puzzling line I'm hearing. I don't think that he could make that argument as exclusively as opposing counsel would have had him make it given the reality that his client wasn't on board with it. And if he had done more to paint it as exclusively a Kevin Koffer did this, he risked the fact that Kevin Koffer would have gotten up on the witness stand and instead of doing what he did, which was clam up and say nothing, he would have testified in accordance with his preliminary hearing testimony and his statement to police that directly implicated Mr. Collins. Yeah, there seems to be this undercurrent of, you know, of Savino being hamstrung in some way. And yet at the PCRA, he didn't say that at all. He said he argued that there was no proof that Collins fired any shots, and in fact, Mr. Koffer, Kevin Koffer, is the one who killed the gentleman by shooting from outside the car. Well, that's... Well, and Your Honor, with, you know, in all fairness, as I said, Mr. Savino is a busy defense counsel. He tries who knows how many murder cases a year. And the PCRA hearing happened long after the fact. So I think what it's more important to focus on is the actual trial record. Counsel, it's been alluded to earlier. The government's very late disclosure of this expert testimony that it wished to present at trial, really, I think, I must say, shockingly late, and the way in which it was then handled by the trial court, does that serve at all to ameliorate the lack of investigation by Mr. Collins' attorney? I mean, are you in a position to say, well, he's being faulted for not carrying out an investigation that he didn't even understand he had a need to do until we're actually in trial? And at that point, there's probably not much he could have done. In an odd way, does that actually help? Does that help you in pointing out that time issue about the lateness of the government's disclosure? Well, I'm not sure that it does, Your Honor. And the reason is because that was just one small piece of evidence in terms of a lot of different ballistics evidence that was available at trial. It was pretty consequential evidence, wasn't it? Well, I would say it was consequential in that it made an inside-the-car-shooter theory even more likely. But the medical examiner's testimony, the eyewitness testimony from Kevin Coffer, who later clammed up on the stand, but we had his statement to police and his preliminary hearing testimony,  where he was sitting not directly behind the victim but in the middle of the backseat and fired shots that traveled from back to front. The medical examiner testified the shots went from the back of the victim's head to the front of the victim's head. That's certainly not consistent with the shooting that happened from the driver's side. Well, back to front, it wasn't total. It was behind the ear and then the eye. That's not that tough a distance. I mean, it's not that radical a line, is it? Well, Your Honor, I mean, I don't want to argue with you or quibble with you about ways that you could possibly interpret that, but I think certainly the medical examiner's testimony along with eyewitness statements clearly implicated Collins. I'm sorry, does that actually cut against you? If the medical examiner's testimony is so significant and it's admitted that he did nothing to prepare, didn't consult another medical examiner, didn't seek to have any kind of pre-cross-examination discovery, does that actually play into the idea that there was a lack of preparation here, which would completely undermine any appropriate defense in a capital case? Well, Your Honor, I'm not sure that the argument was ever made that he should have consulted an additional medical examiner, and I'd just like to bring the Court's focus back to what we are really reviewing here. It's at the review of the Pennsylvania Supreme Court's determination that counsel was not ineffective under the Strickland Standard. Well, more precisely, Ms. Orber, the Pennsylvania Supreme Court's decision was, it wasn't ineffective to not get a ballistics expert. That's the question they posed and answered. They did not, it seemed, pose and answer the question, were you ineffective because you utterly failed to prepare? And that's the argument that's being presented to us now. Now, you've made a pitch, I understand, that, hey, they've sort of shifted the ground a little bit in the way they're presenting it, but for sake of discussion, let's take it as given that they presented to the Pennsylvania Supreme Court the argument that this guy didn't adequately prepare. And then the Supreme Court writes a decision that says it wasn't ineffective to not get a ballistics expert. Do we owe edpedeference if the Pennsylvania Supreme Court narrowed the question, didn't answer the question that was being raised by defense counsel, or by the counsel for Mr. Collins? Well, if, Your Honor, if you find that there was a broader question posed than the question that the court answered, then the portion of the question that the court answered is what is due edpedeference. However, I would also point out that where a reviewing state court is silent as to a portion of a federal question presented to it, but the lower state court did address that question, then the lower state court's adjudication of that issue is due edpedeference. So at that point, you have to look to the PCRA court's adjudication of the merits. Okay. And did the PCRA trial court address the question of, hey, Mr. Savino, he just flat out didn't prepare. He walked into court and he decided to wing it. I'm relying on myself. That's my strategy. Well, Your Honor, I think I would have to take a careful look at the PCRA court's opinion, which is in the record. And if you'd like me to submit supplemental briefing on that, I'd be happy to. But you stand in here with us. You don't have anything either from the Supreme Court or the trial court that addresses the broader question that Ms. Dolan is telling us they've been asking all along? Well, I think, Your Honor, that the way you can read the state Supreme Court's opinion is that they considered the entire question before it, and they read it that the thrust of the question was the ballistics evidence, and that's what they focused on. They also, not to beat a dead horse, were constrained in that they had to review the claim that was before them, which was an appellate counsel ineffectiveness claim. So they looked at the claim that was before them. They said, you know, we're focusing on the ballistics evidence, which seems to be the thrust of the argument, and we can't say that appellate counsel was ineffective for raising other claims rather than this claim about the ballistics evidence. Can we talk about prejudice for just a minute? What's your response to Ms. Dolan's argument about there's prejudice here for sure? You heard it. What's your response? I disagree that there's prejudice here, and I think, as I already alluded to, the medical examiner's testimony is certainly problematic for Mr. Collins. We also have evidence of witness intimidation that the jury was clearly aware of and which made an impact in this case, not only in the case of Kevin Cofer but also Monica Small, who told police that she had seen Collins with a .45 caliber handgun the day before the murder and then testified at trial consistently with her statement to police in all respects except for all of a sudden she didn't remember the gun, and she also testified that coincidentally Collins had been calling her house prior to the trial. But, you know, well, here again maybe this is where Savino was also ineffective because that could be just as consistent with a person who is innocent and is just really anxious to get out of jail because they didn't do it and they want people to own up to, you know, what really happened because they're innocent. Well, but with all due respect, under the AEDPA standard of review, the question is whether the state court could have interpreted all of this evidence in such a way as to reasonably conclude that there was no prejudice here. It's not that Collins now gets the benefit of every doubt and all evidence should be seen in hindsight as going his way. The question is really was the state court unreasonable in finding that the Strickland standard was not met here. Did either state court decision deal with the prejudice question? I thought there was an acknowledgment earlier that... Yes, the PCRA court decision did deal with prejudice directly, and that decision is due AEDPA deference here. Also, Collins got up and testified, which as we know is his constitutional right, so not anything that Savino could necessarily control. He testified completely incredibly. He, on the night of the murder, came rushing into Tiaza Cox's house and said, there were guys that pulled up and shot at the victim from outside the car and killed him, and here we are, oh my goodness. And then when he talked to police, he said, oh no, no, I didn't see it. They dropped me off, you know, around the corner before the murder even happened. And then when he was cross-examined about that at trial, he told a cockamamie story about, well, I was worried that my girlfriend would see me getting out of the car at Tiaza Cox's house and be jealous. So the jury was really faced with evidence of witness intimidation, completely incredible testimony by the defendant, the medical examiner's testimony that the shots came from the back towards the front. What do we do with Mr. Savino's own statement when the new ballistics evidence comes to light that, hey, this is, paraphrasing, this is really important stuff. This could be highly significant in the case. I've got to do something with this. And the court says, you're right, I guess you'd better do something with that. And then he does nothing, nothing. Is that a? Well, Your Honor, I would say what I would say is that he was boxed in by his client's decision to testify. He was boxed in by the fact that if he had pointed to Kofor, then, you know, Kofor could have gotten on the stand and implicated his client instead of staying mum. So I think really we have a defense attorney who was hamstrung by the circumstances of his case, and that under the deferential standard of review and the deferential Strickland standard, we're really stuck with that. Well, you're surmising that. But his testimony in the PCRA is that he was trying to point at Kofor. So why wouldn't he have gone out and gotten another expert to help point at Kofor? You're surmising about his being hamstrung with his client's wishes. That's not what Savino said. He didn't say that he was hamstrung by his client's wishes. Does he? Did he? No, he did not say that. No. So we can't surmise that the strategy was yet again something different from what he testified. Well, but what we can do, Your Honors, is the question here is, is there any reasonable basis to uphold what the state court did? And I think clearly there is. I think you can, you know, find fault with what Savino said at a PCRA hearing many years after the trial when he may or may not have remembered his reasons for doing everything. But the important thing here is whether the state court acted reasonably in rejecting the claim before it. Wasn't Mr. Savino really hamstrung by a fundamental misunderstanding of the law? He had this notion that if he retained an expert who came up with an unhelpful analysis, that he would have to disclose that to the prosecution, which obviously is completely wrong. Isn't that what was really driving his decision? In fairness, it's not completely wrong. The rule is that he would not have been required to turn that over in mandatory discovery. But he could not ensure that the trial court would not, upon motion of the Commonwealth, issue a discretionary discovery order. If he wasn't going to call the witness to testify?  That's hard to imagine. I'm trying to find, and I pause as I'm not finding it, I guess, where the PCRA trial court addressed prejudice of this sort. They do talk about prejudice with respect to being surprised about COFR invoking the right against self-incrimination. But is there a place in the PCRA trial court's decision-making where it? Well, if Your Honor would excuse me, and I can just run back and get the opinion, or I can assume that I'm out of time. I certainly can address this supplementarily. All right. Thank you. One thing, Your Honor, is that you'll see in the, just because it's faster to find at this moment, Your Honor, you'll see in the State Supreme Court's opinion where they reference the PCRA court's ruling. The PCRA court said on the prejudice prong, the PCRA hearing testimony of Lieutenant Welch conceded that the ballistics evidence could support the Commonwealth's theory that the shots were fired from the backseat of the Taurus. Consequently, the court concluded trial counsel's failure to present at trial the testimony of Lieutenant Welch or another independent ballistician did not result in prejudice to appellant's case. But that's also on the ballistics itself. Yes. Isn't it difficult, if there's no investigation, it's almost difficult to analyze the prejudice piece, because you have to kind of go back and say, well, okay, if he looked at things, what would he have done differently? And when there's just a total lack of investigation, it seems to me that perhaps the threshold for the prejudice prong should be lowered somewhat, because it's very difficult to figure out. Well, I think also, Your Honor, I'm wondering where anywhere in the record there's a finding that there was a total lack of investigation. I think, you know, that's an argument that opposing counsel is making. What is in the record of what investigation he did do? That's not our burden. That's her burden. I know, but the point is she's tried to figure it out, and if she had found something, you obviously would have reacted to it, but there's really nothing there. Well, you said that she overstates it. So having said that, you have an obligation to tell us how she overstates that proposition. Well, Your Honor, I'd be happy to do further research for you. This particular aspect of the question was not the focus of briefing really at any point up until now, so I would request permission to submit a supplemental brief on this issue. I do think that the blue brief says failure to investigate, failure to investigate. I mean, it's right in front of us. Well, the way I read it respectfully, Your Honor, was failure to investigate such that he could put forth this defense theory that was different from the one he presented. Well, that's why I say it's tough to figure out the prejudice because you're kind of shooting at the apples in the barrel. What is it you would have figured out and done differently? It's tough to say because there was absolutely nothing done. Okay, anything further from here? All right, counsel, I think we appreciate your argument, and if we need something supplemental, we will ask for it. Very good. Thank you, Your Honor. Thank you. Counsel Repetil, you're reserved. Just to address the prejudice point again, it's our position that because the Supreme Court didn't rule on prejudice, you don't need to go to the underlying court. But even if you did, if you look at the PCRA court's opinion, it's at A117 where it talks about prejudice. The PCRA court says there's no prejudice based on a misstatement of the underlying record, which itself is unreasonable and shouldn't be deferred to under AEDPA. Wait, wait, wait. Can we back up and say that? Yeah, the PCRA court said that when it was doing the scales of whether there was prejudice here, said that counsel adopted a defense that he didn't actually adopt. And it said that counsel adopted the defense that the shooter was in the car, the driver was in the car shooting. And that's just not supported by the record. So even if you do go to the PCRA court's decision on prejudice, it's unreasonable because it's not based on the record. I mean, when you do a prejudice analysis, it's not, you don't look at, okay, did we prove reasonable doubt as appellant in this case? It's would the evidence have influenced the jury's appraisal, and was there a reasonable probability that the outcome would have been different? And when you weigh the scales, when you weigh the scales, what did the jury hear? They heard Kevin Cofer's statement that Mr. Collins was shooting from directly behind the victim. He said that in his pretrial statement. It's at A712. They heard Officer Finer's opinion that the ballistics evidence was consistent with Mr. Cofer's statement, and they heard that a gun had to have been fired within 18 inches of the headrest. So that's what they heard. And they heard Mr. Collins' counsel arguing that he was outside. Ms. Dolan, didn't they also hear that Mr. Collins wasn't sitting directly behind the victim? He was sitting in the middle of the back seat so that he was shooting at an angle? Didn't they also hear a medical examiner say, look, that bullet went in the back of the head, came out by the eyeball. The bullets are in the dash. I mean, none of that's rebutted. It seems pretty clear. Wouldn't they have heard somebody like Mr. Welch acknowledge on cross-examination, just the way they heard it in the Picker Court, well, yeah, the shot could have come from behind. How do we, I mean, our obligation at this point, it's not that you haven't raised interesting discussion points. At this point, we're under a doubly deferential set of review where we're trying to think about, is there any way you can look at what the Pennsylvania Supreme Court did and say that was an appropriate handling of the case? Well, they didn't address prejudice, so we can't look to them for that. So as far as that other evidence, the medical examiner wasn't called to testify about where the shots came from. I mean, a head can move. I mean, who knows where the head was. Clearly, if he was sitting as a passenger in the front seat. Dashboards don't move. Well, I mean, if Kevin Koffer fired the shots and Kevin Koffer set up my client, then Kevin Koffer could have fired head on right into the dashboard. That explains that. Yes. I mean, the Commonwealth is trying to make the evidence seem that it was overwhelming against my client. Their main witness refused to testify at trial. That devastated their case. The rest of their case was cobbled together with circumstantial evidence. That's why they had to bring the letters in. That's why they had to bring in the thing about the 45, which was not conclusive. All the circumstantial evidence that they raised, they had problems with it. Now, I have a generalized question for you, if I might. My colleagues will bear with me. The Pennsylvania Supreme Court seems to go out of its way to indicate the ground has been shifting here on Picker Review. They say that, quoting the Commonwealth, that the theory that a ballistician should have been called to testify in support of the defense presented at trial that the gunshots were likely fired from outside the Taurus is one thing. And now they're saying that the theory is that a defense ballistician should have been called to testify that the gunshots were likely fired from within the driver's side. The Commonwealth contends these are substantially different claims. And then, according to the Pennsylvania Supreme Court, there's an acknowledgment by Mr. Collins that the theories or arguments in support of the claim differ, but the claim itself is one and the same. So I guess my question to you is, if the arguments were shifting, can we fault the Supreme Court now for focusing on the question of whether a ballistics expert was chosen or not, and not for answering the broader question that you're emphasizing to us at this point? Well, I mean, the argument that counsel didn't prepare for trial has never shifted. That's always been a part of our pleadings. That's always been a part of our briefing in the case. So, yes, we can fault the court for ignoring that. I mean, it's pretty clear that counsel did not prepare for capital trial, and that's just not addressed at all. And the whole conduct of what he did at trial, the Commonwealth's case, and basically his trial strategy was more dictated by what he didn't do than by what he did do. And that is just not effective representation. All right, thank you. Take the case.